# HERTZSCHRAM

## ACCESS EXCELLENCE

Howard Hertz
Victor M. Norris
Robert P. Geller
Steve J. Weiss [1]
Walter J. Piszczatowski
Kenneth F. Silver
Gerald P. Cavellier
Lisa D. Stern
Eva T. Cantarella
Steven P. Jenkins
Elizabeth C. Thomson
Daniel W. Rucker
Laurie S. Raab
Joseph A. Bellanca
Matthew J. Turchyn
Fallon Yaldo Sandiha
Cristina M. Crescentini [2]
John Monnich, Jr. [2]
Eric D. Berlin
Kristen H. Randall
Donna Virkus

www.hertzschram.com

wallyp@hertzschram.com

north:
(mail center)
1760 S. Telegraph Rd
Suite 300
Bloomfield Hills, MI 48302
ph: 248.335.5000
fax: 248.335.3346

downtown:
Guardian Building
500 Griswold
Suite 2400
Detroit, MI 48226
ph: 313.438.5001
fax: 313.438.5002

Of Counsel:
Bradley J. Schram [3]
Jeffrey A. Robbins [4]
Scott G. Weinberg
James K. Friedman
Herschel P. Fink [1]
Alexander Stotland [5]
Robert Gittleman

[1] Also Member of Fla. Bar
[2] Also Member of California Bar
[3] Also Member of Fla. & D.C. Bars
[4] Also C.P.A. and LL.M. in Taxation
[5] Also Member of N.Y. Bar

May 12, 2025

The Hon. Gershwin A. Drain
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd., Room 751
Detroit, MI 48226

Re:    United States v. Daniel L. Israel
       Case No. 23-cr-20538

Dear Judge Drain:

Defendant, Daniel L. Israel ("Mr. Israel" or "Dan") will appear before you for sentencing on May 22, 2025, at 2:00 p.m., and on his behalf, I submit this memorandum for Your Honor's consideration in advance of the hearing.

Mr. Israel entered a plea of guilty, pursuant to a Rule 11 Plea Agreement, to a single-count Criminal Information, and he comes before the Court as a deeply humbled man. Mr. Israel recognizes that he made some significant mistakes, violated the law and readily accepts responsibility for his crime. Without diminishing the significance of the offense or his own actions, when determining

Mr. Israel's sentence, I respectfully ask the Court to weigh the extent of Mr. Israel's own direct involvement in the charged conduct, and his otherwise unblemished record, including his lifelong commitment to hard work, his family, his employees, and the positive impact he has had on so many people within our local community.

Mr. Isarel has accepted responsibility and he has no criminal history. The U.S. Probation Department ("Probation") has determined that Mr. Israel, as a first-time, non-violent offender, is entitled to an additional 2-point reduction. USSG §4C1.1 provides for a decrease of two levels for the offense level determined under Chapters Two and Three for offenders who do not receive any criminal history points under Chapter Four, Part A, and whose offense did not involve specified eligibility criteria. Mr. Israel satisfies both conditions and thus, Probation determined he is in offense level 12, Zone C, with an advisory Guidelines range of 10-16 months. It is not clear as of this date what sentence the Government will recommend.

This initial Guidelines calculation, however, does not include any downward departure motion by the Government, which is contemplated by Mr. Israel's plea agreement, but as of the time of this submission, it has not yet been provided by the Government. Even a limited downward departure will bring into play a new application note promulgated by the U.S. Sentencing Commission. The Commission has promulgated Application Note 10(A) to USSG §5C1.1 of the advisory Guidelines which, in pertinent part, states, "If a defendant receives the zero-point

2

offender adjustment, 'and the defendant's applicable guideline range is in Zone A, or Zone B of the Sentencing Table, a sentence other than a sentence of imprisonment [. . .] is generally appropriate.'" Thus, the Sentencing Commission now encourages this Court to impose a non-custodial sentence for Mr. Israel.

The factors set forth in 18 U.S.C. §3553(a) guide this Court in determining the appropriate sentence after the Supreme Court's landmark decision in *U.S. v. Booker,* 543 U.S. 220 (2005), and are certainly well known to this Court[1], as is the requirement that the Court "impose a sentence sufficient, but not greater than necessary, to comply with" those purposes. Familiar, too, is the Supreme Court's admonition in *Gall v. United States,* 522 U.S. 38 (2007), that in applying these factors, a sentencing judge "must make an individualized assessment based on the facts presented" quoting its earlier opinion in *Koon v. United States,* 518 U.S. 81, 113 (1996).

Counsel respectfully submits that the application of the §3553(a) factors, especially given the new guidance from the Sentencing Commission, weighs heavily in favor of a downward variance and a sentence of supervised release and home confinement for Mr. Israel. In further support of this request, Counsel submits materials from Mr. Israel's business associates, friends, family, workers, and former

---

[1] As a result, counsel will forego the recitation of much of the boilerplate language associated with the U.S. Sentencing Guidelines ("Guidelines") and 18 USC §3553.

employees, along with this memo which contains some of undersigned counsel's own thoughts regarding Mr. Israel, the circumstances of this case, his future, as well as bases for downward departure/variance, and other relevant §3553(a) considerations.

## **Personal History and Characteristics**

The Presentence Report contains a summary of the obligatory general factual background information about Dan Israel but, by its very nature, cannot provide a complete picture of his life. The best way to get to know a person is to spend time with them, but since the Court does not have that opportunity, perhaps the second-best way is to read what others say and feel about that person.

Thus, in order to provide a more complete and accurate picture of Dan Israel, I have attached a collection of letters from people who have come to know him in a wide variety of settings. The letters give insight to Mr. Israel's "history and characteristics" (§3553(a)(1)) from people that know him best,[2] provide ample grounds for variance and add the needed personal insight into his character. The letters come from people in all walks of life and when viewed in their totality, describe who Mr. Israel is, far better than I ever could. (see Exhibit "A"). Most notably, many of these letters were submitted by people who know Dan well, and

---

[2] The letters are organized alphabetically by last name for ease of reference. Additionally, counsel only drew excerpts from many, but not all, of the attached letters. (See Exhibit "A").

once they became aware of his criminal prosecution, asked for the "privilege" of writing something on his behalf.  Many of these requests were unsolicited.

Overall, the letters show that the conduct which brings Mr. Israel to this moment stands in stark contrast to the rest of his life. Some common themes emerge through the words of his friends, family, employees who worked with and for him, and his colleagues: that he is man of integrity, a man of his word, a great boss, a devoted family man, an extremely loyal friend, a dedicated and tireless worker, a selfless mentor who has long shown commitment to his employees and who tried to help them whenever and however he could, and a successful, extremely hard-working, and caring businessperson.

### Dan's Personal History

Daniel I. Israel was born in Detroit, Michigan on November 12, 1961, to the marital union of Sid and Harriet Israel. His father passed away in 2005 from a brain tumor. His mother, 89, lives in an assisted living facility in Florida. Dan is very close to his mother, in fact, they speak daily. He was the middle child of three boys and had a very good childhood where he felt loved and supported. He spent most of his youth in Southfield, Michigan.

Marc Israel, Dan's older brother, lives in Huntington Woods, Michigan, and is a very positive source of support. Dan's younger brother, Bruce Israel, lives in Bloomfield Township, Michigan. Bruce and Dan were previously in business

5

together. Bruce Israel has also been federally charged and pled guilty to two felony conspiracy counts. Dan's one regret is that he and Bruce have had a strained relationship for many years, dating back well before the Government's investigation, and they maintained contact largely only for business and limited family matters.

Dan grew up and attended school in Southfield, Michigan. He struggled with severe dyslexia and flunked 9th grade. His parents sent him to specialized high schools to help overcome his dyslexia and, ultimately, he struggled to graduate from Denison University in Granville, Ohio, in 1983.

When he was 17 and his brother Bruce was 15, they started painting stripes on parking lots over summer vacations to earn money for college. After college, Dan turned down corporate job opportunities to focus on building the business he began in high school. During the striping "season", he worked 7 days a week, restriping parking lots in Michigan and Ohio. He joined the painter's union so he could have work during the off season, and worked the night shift at Ford and GM factories painting the safety lines in their plants. In 1988, he sold the striping business and started Asphalt Specialist's Inc. (ASI). It was that same year that he married his college sweetheart, Cindy.

ASI started with a dump truck and a small asphalt paving machine, patching and paving small parking lots. Dan slowly built the business, started a related

business – Lou's Trucking – and later bought another trucking company, TKMS. He was determined and driven, focusing on his growing family and his business.

When the financial crisis of 2008 hit, although their attorneys advised them to file for bankruptcy, the brothers went to work and rebuilt the business. Although Dan and Bruce's relationship had been declining, the strain from that experience made their relationship even worse. They were, however, able to maintain a cordial working relationship with each working in separate arenas. While Bruce Israel and Tim Baugher ran sales, Dan's days were jampacked dealing with all the logistics of managing multiple jobs and crews at once. He had numerous folks reporting to him and assisting him (see organizational chart, Exhibit "B"). Dan ran all the fieldwork, all the administration, he handled money management for the ASI companies, the insurance, and all HR issues. He ran two trucking companies and was in charge of all equipment purchases, five garages which were open 24 hours a day during the busy season and numerous work crews. Tim Baugher succinctly stated D. Israel was not technically involved in writing bids or capable, he stayed out of sales. Other than with customers who were his friends or business partners, Dan did not get involved in sales. Although the business strategy was successful, the brothers' relationship continued to deteriorate, and they had no interaction other than what was necessary for business. Dan describes their estrangement as one of the greatest failures of his life.

In order to get a more holistic and better understanding of Dan Israel, attached to this Memorandum are numerous letters from a diverse array of people who know him best. I appreciate that reviewing this material is no small task, but am confident that it will add an important dimension to the Court's understanding and ability to fairly sentence Dan. A picture emerges of a man who was driven by work, but is first and foremost a family man, devoted to his and wife and two children. A person who never forgot where he came from and someone who has maintained the same humility and work ethic that he forged in his high school days. He is an inspirational person and mentor who thrives on helping others reach their potential, and a "straight shooter" who tells it like it is. He is a man of compassion and empathy, who is always there to lend a hand. And despite his criminal conduct, he is a man of great integrity. His many other humane qualities will be seen in the excerpts that follow.

## Employee Letters
## Generosity/Love of his Fellow Man/Respect for All

Dozens of employees – most of them laborers – wrote to show their support of Dan Israel. They describe a hard-working man who treated everyone equally, genuinely cared about them and their families, and was generous not only with his money but more importantly with his time. These qualities, among others, engendered loyalty in an industry typically plagued by high worker dissatisfaction and turnover.

Douglas Howell, originally hired to work on a paving crew, writes: "The positive impact that he has had on the lives and families of employees speaks volumes about his character not only as a business owner, but as a person." Doug Howell was made interim CEO of ASI in 2024 and is now its acting COO.

Kimberly Kern, ASI's accountant, wrote of his "… truly compassionate hiring practices. Many of his employees had previously intermittent employment, past convictions or had served in the military. These are populations that often find it hard to get employment. Dan was willing to give people second chances and in all the interactions I have seen, he treated everyone the same. Dan does not consider himself better than or above people who are perhaps at a very different social or economic place in their lives."

Dan also provided opportunities to those with sobriety problems. Steven Marquis writes "He always treated me with respect. When I got into some trouble with the law in 2018, Dan gave me a second chance. He saw potential in me that I couldn't see in myself. He gave me opportunities within the company to help me get through the hardest part of my life." Steven continues:

> I am now 6 years sober from alcohol. I have become a heavy equipment operator and job site Foreman … I have held a position that I never thought possible because Dan believed in me enough to take risks…Dan never had to spend the time and resources he did on me. He could have fired me considering it wasn't my first mess up.

9

"I am positive that if Dan handled the situation differently, I wouldn't have achieved what I have today. Today I have a wife and 4 kids. I am more successful in my job than I ever imagined I could be. I wouldn't be where I am today without the direction and leadership of Dan Israel.

Anthony Nowak also was given a second chance. At the time he was hired, Dan knew Anthony had lost his driver's license due to two DUIs. "Dan believed in me, he saw my potential beyond my past... He built a company that not only preached the importance of family but actually implemented it." Anthony eventually got his license back, but was required to have a breathalyzer in his vehicle. "Dan found a way to help me advance in the field while navigating through my restrictions; something no company I have ever worked for has done for me... Throughout all the difficulties that situation presented, he never held it over my head... when the time came, and I could drive with a breathalyzer, Dan didn't hesitate to make it work so I could have one in a work truck... If Dan has taught me anything, a man's mistakes don't define him."

Dan personally interviewed candidates for entry level positions on work crews. He cared about the people, not just about their qualifications and experience. During his interview, Nelson Copeland found that "Dan was truly interested in me. What values I held. I was impressed of his sincerity during our conversation. Up to this point in my driving career I have always been treated as a number, a disposable resource if you will. . . Dan and ASI have not only given myself a reliable and

respectful way of living, my two sons have since joined the ASI family, earning a good wage and skills that will last a lifetime."

ASI employees felt valued and respected, regardless of their positions. Dan was viewed more as a coach than as a boss, and treated employees as colleagues, not subordinates. Other business executives who worked with Dan were struck by this. David Sass, a banker, has spent time with Dan on job sites, and writes that he was not afraid to "… 'pick up a shovel' when needed to work alongside his team to help get things done. That is a rare quality for an owner/president."

Josh Cascade, a consultant to ASI wrote:

> "In my earliest days of working with ASI, I found Dan Israel to be very unique among successful co-owners/operators. Dan was responsible for day-to day operational management of the Company as opposed to sales activities. And he drove the core Company values that centered on safety, quality, and employee morale and retention. … These employee centered values were not ignored slogans or mission statements. These values were Dan's life passion and he spoke constantly of his responsibility and relationships with the people of ASI.
>
> Dan Israel led by example, with a belief it was wrong to ask employees to do what he wouldn't. No matter the level of success or years on the job, Dan woke at 4am each day and was the first person in the office…Dan would then visit job sites, working side by side with the workers. There was no task beneath him, as he pridefully helped with the hardest tasks in the most challenging conditions. More importantly, Dan treated the ASI employees like family. Because of Dan's humility and curiosity, he made quick connections with people from very diverse backgrounds. And because of his genuine care and kindness for employees on and off the job site, they love him to this day.

11

Employees wrote of how Dan made them feel valued, and how they took pride in the company's success. Bryan Sommerville, who started at ASI as a trucker, explains that Dan has always, "…made everyone feel that they are all on the same team at the same level and that no one person is better than the next and that is a trait of a true leader and overall good person." As Douglas Howell writes, "Those people may not remember every lesson taught but will always remember how he (Dan) made them feel."

Ruben Martinez (not the Government's lawyer) writes:

> The most important lessons he taught me was not (sic) about business but about life. And in difficult times is when Dan really showed his true self. I knew I could lean on him or get support I need in those moments. He was always there like the big brother… Dan' strong personality is set off with his unique ability to let you know he cares and his quick and funny since of humor (sic). He treated me as his equal or peer, giving me respect. Dan treats everyone that way. There have been so many small lessons or words of advice that he has shared with me over the years that have profoundly shaped me into who I am today. Its (sic) difficult to express in words how he has changed my life and how I feel about him.

Garrick Ringwelski writes "Dan Israel taught me more than anyone has ever taught me in my entire life… Dan taught me about people, employees, customers, sub-contractors, co-workers and much more. He taught me how to speak to them and how to treat them…" Garrick continues, "He treats people the same. It doesn't matter who you are, rich or poor, customer or employee, white or black. He treats everyone equally." Thomas Zuccaro worked with Dan at job sites. "We had lots of fun on job

12

sites. ... I remember him being on the equipment working side by side with us. And when it got late, he would always make sure we had food to eat. I really loved working really hard side by side with him. Finishing impossible jobs within impossible time frames, being successful. I enjoyed watching ASI grow and grow."

Dan's mentoring gave employees opportunities to grow and rise within the company. Salvatore Militello worked in the trucking department. "Dan and I became very close, working hand-in-hand for many years. I was able to get to know a man that changed the lives of many people, including myself. A truly selfless man that enjoyed helping people. Together we started a program called 'Homegrown'. This program gave us the ability to promote growth from inside the company and gave them the tools they needed to succeed. I myself am very proud of this program, which was the brainchild of Dan Israel." There are many examples of the success of this program: Stephanie Racine, hired as a data entry clerk, is now Corporate Controller; Tony Allen, hired as a truck driver, is now President of the Trucking Division; Mark Lindsey, a former truck driver is the Logistics Coordinator; Ruben Martinez, a former equipment operator is now a Project Manager. And COO Douglas Howell started in the paving crew.

Countless employees benefited from Dan's compassion and generosity. Mark Lindsey wrote "Dan has been a mentor to me my whole life. Dan always believed in his people and he always gave opportunity to those who wanted it." Mr. Lindsey

found Dan's humanity his most outstanding quality. He writes, "I had a brother who worked for the organization for 14 years and died at 40 years old. Dan made sure he was at the hospital for me and met my parents when they arrived and flew my brother back to Alabama to his final resting place." Mr. Lindsey took over his late brother's mortgage, and he was about to go bankrupt trying to handle his own mortgage in addition to his brother's. "Dan gave me $47,000 to pay off the mortgage…and let me pay him back when the house was sold. (Who does this)". He writes that this was not an isolated example of Dans generosity. "…I remember Henry who was dying of cancer Dan made sure his family was taken care of. Randy Walker an equipment operator who had an almost fatal motorcycle accident and was out for a year he was paid for that year and medical expenses and the list goes on and on."

Timothy Marquis writes, "Three years ago, I had to have a bypass and Mr. Israel continued to pay me for the 3 months I was off work so my family would not suffer financially. "…my friend, boss and brother is a great man who did a bad thing and truly regrets it more than you will ever know." Salvatore Militello has ". . . witnessed Mr. Israel helping more people than I can count when they were having difficulties no matter what it was in their day to day lives…I had a very close friend of mine that also worked with us that passed away from cancer. Dan took care of the entire funeral as well as the wake, taking care of the cost for the hall, and all the food. He never wanted recognition for these things, which he did anonymously."

Thomas Zuccaro writes, "…if there were an untimely death of one of his employees Dan would offer to pay for all the funeral cost and he also reached in his pocket to give the fallen workers families money to help them in their time of need…. He was not a selfish person."

Paul Cassie tells us that "Over the last 24 years I have had some tough times." His wife was first diagnosed with cancer in 2015 and "I couldn't have asked for a better support from an employer." The cancer returned in 2020, and Mrs. Cassie passed away. "During that entire time ASI and Mr. Israel went above and beyond (what) any employer would do. I was paid for many missed days of work. I was repeatedly told by Dan do not concern yourself with days missed at work. During the lowest point in my life Dan had my back and made sure I never had to worry about my finances. He never asked for any repayment…Dan Israel has been an important part of my family's life for over two decades. I am proud to say Dan Israel is a friend."

Ian Burnstein, said Dan helped with "… loans to dozens of employees that would have been in a terrible spot without Dan. . . . Recently, Dan did something heroic. He had an employee that needed a kidney transplant and was not having an easy time navigating the healthcare system. . .With Dan's help, we were able to successfully get him on the transplant list. Without Dan, this would never have happened." Ian continues, "I have also been the beneficiary of Dan's extreme

generosity. In 2003, I suffered a grand mal seizure and was in a coma for eight days. I suffered severe brain damage, and it was touch and go for a bit. When I came out of the coma it took me over a year to get back on my feet. Without hesitation, Dan called my wife and told her that I will remain on the payroll for as long as it takes, and he will support me. Who does that?" When a free clinic named in honor of Ian's father needed a new parking lot, Dan once again stepped up to the plate. "Without hesitation, Dan had a brand new parking lot installed in four weeks and it was all free…This donation literally allowed us to more than double the capacity of patients that we see."

Dan had and still has a strong sense of responsibility for the ASI family. Once someone was hired, they were fully supported. William Collins, a self-described "tire guy" met Dan Israel when he was hired in August 2014.

> The beginning of our relationship was rocky. I got suspended a few times for being late. I was late numerous times and am not sure how I even kept my job…. He (Dan) then said if I showed up on time and gave him a solid year without being late that he would make me a "made" man…Now fast forward to 2021 and I fully understood what Dan meant that day in 2015. I was a 'made' man because I am someone with the skills and knowledge to do anything I put my mind to. . . I've watched him turn people's lives around people that most wouldn't even give a second look let alone a job. He has helped those who felt like failures become successful individuals…"
>
> * * *
>
> …I have gone to this man for advice on life and many things no one ever taught me and at a certain point this man became a father figure.

16

He took time out of his busy day to teach me how to budget and understand many things no one has ever taught me in life.

* * *

…even being the owner he was very involved with us no matter what. He always made time to come see all the jobs and talk to everyone, even loaning some of us money in hard times or letting us borrow a truck while our personal car was down, without hesitation not even a second thought.

Tracy Stulberg PhD is a family therapist. Several years ago, Dan called her because he was concerned about an employe who was struggling with loss and extreme stress. He could have just either fired her or put her on medical leave, as her diminished performance was impacting his company. Instead, Danny made it clear that her job was secure, asked me to provide therapy to help her deal effectively with her loss, and paid for her therapy…"

Letters from Dan's friends echo the themes expressed by his employees. There are letters from friends he has known since childhood, and others he has only recently met. Friends describe Dan as "…honest, self-aware, generous, caring…" (Mark Bernstein); "self - taught" (Richard Broder); "courageously honest and unshakably ethical" (Emily Lark Kasal); "…a straight forward, honest and integrity filled individual" (Ron Lederman); "relentless to learn" (Denise Ilitch); "self-reflective, constantly striving to better himself." (Josh Mondry); a competitive person who "…always plays his hardest but always plays fair." (David Dulberg); a man who "…always stands for integrity first, including being responsible for a poor

17

decision. (Josh Pokempner); "...one of the kindest and most generous people I know..." (Edward Hersch). Ryan Chapman writes, "Understanding Dan as a human and friend is vital before analyzing him as a businessman."

Dan not only has an enviable number of friends, but these friendships are characterized by an unusual level of depth and intimacy. Perhaps one reason for this is the intense interest he has in other people. Deborah Berger speaks for many when she writes "From the first time I met Dan, I was impressed by how he interacted with people. He asks questions to truly get to know you. When you talk to Dan you feel free to share your feelings and ideas. He makes you feel like your opinions matter and are important."

David Silbert is one of, if not Dan's oldest friend. They grew up one block away from each other, went to elementary school together, and even worked together stripping parking lots during high school. Dan's work ethic was apparent even then. Later in life, Dan helped David in his chiropractic practice, sharing one of his many adages, the "5Ps: Proper Planning Prevents Poor Performance", which David still uses in running his business.

Dan's friendship with Jonathan Siegel began in high school, and they have remained friends for over 45 years. Jonathan writes, "Dan was always a hard worker, a grinder, never afraid to roll his sleeves up and do the hard work." Jonathan continues, "Dan Israel is one of the kindest and most generous people I know not

only with money but more importantly with time and counsel." When Jonathan's daughter died unexpectedly "Dan was one of the first to reach out and offer his condolences . . . and has continued to check in on me and how I'm navigating my new reality. He has shown me nothing but true empathy and compassion for my loss."

Michael Good who met Dan in freshman year was impressed with Dan's giving and generous nature:

> As I grew to know Dan I began to understand his strong commitment to family and friends, incredible optimism and positive outlook, his drive and desire to achieve and his deep sense of generosity. One of the earliest examples I remember is when Dan, several others and I volunteered to coach youth basketball in Newark, Ohio while we were in college. As with any task, Dan committed himself to the kids and the program immediately. You could see the young boys gravitate to Dan's incredible enthusiasm, promoting their self confidence and compassion for each other. Throughout his life, Dan has coached, mentored and supported a myriad of teams, developing young men and women and building character and belief in self. Teaching them life lessons they can use outside of sport to become successful engaged members of society.

> On a personal level, Dan has been a great friend and compassionate listener. He and I both married our college sweethearts and over the years, enjoyed reconnecting and catching up with each other as the talk always drifted back to our wives, Vanessa and Cyndi. We were both very committed to our marriages and always talked about how their support is what kept us going in the most difficult of times. In March of 2016 my wife was diagnosed with Pancreatic cancer and after a five year battle, it took her life. It is in these moments of life that we need the support of family and friends most and true to form, Dan was on the scene, providing support and love…

* * *

19

One of the things I learned early on in my life is it is not what you do when you fall but what you do when you get back up. I have seen Dan fall before and I know how seriously he takes failure and then commits to a different outcome. In my personal conversations with him, I can feel his deep sense of remorse and regret over what has happened. More importantly, I sense his commitment to make it right through whatever is deemed necessary and move forward with a determination to never make this type of mistake again. He is clearly very serious about rehabilitation and his desire to make things right again.

Dan was also there for Kimberly Hickson when she lost her husband. Kimberly is a good friend of Dan's wife, Cyndi. She writes, "When my husband was dying, Dan was the only spouse of my girlfriends to call me and say 'Kim, I know you and Cyndi are friends, but you are also my friend. Let me know if there is anything I can do and I mean it! Dan really did mean it. He will jump at a moment's notice to help any friend that is in need."

Dan didn't just befriend individuals; he befriended families and took a special interest in young people. Deborah Berger writes "Dan always took a special interest in our children. …he hired our young kids to help out so that they may experience the value of hard work and doing an important job." When her son Victor was 18 years old, he bonded with Dan on a family trip. Victor "… really appreciated Dan as a friend and mentor. He shared his experiences through college and his business years. Dan was so humble and reflected on how he could have made different decisions along the way. I truly believe his honesty and friendship has helped mold Victor into the man he is today." Deborah's husband Michael adds that Dan has

"…created a connection with my kids . . . My children often connect without my knowing since they have their own relationship with Dan. . . He mentors and motivates all our children to be the best they can."

Dan has a very close relationship with his nephew and godson, Alec Farrington. When Alec was struggling with severe mental health issues and feeling lost, Dan was there for him. "He offered me not just a job with ASI but also personal and professional mentorship. He saw potential in me when I struggled to see it in myself, and became a guiding light during a dark period of my life. Dan's desire to help me grow and take control of my life and future was both selfless and transformative. His support not only provided me with a source of income but also helped me regain my self-confidence and direction. I can genuinely say that I would not be where I am today without his unwavering support."

Dan also developed relationships with his own children's friends. Jacob Chapman, a friend of Dan's son Ben, writes "I have known Dan for much of my life, and as I have grown older, Dan and I have grown much closer. I want to take you through a few of my big moments with Dan to demonstrate who he is to me." When Jacob became engaged, he planned a small celebratory family dinner. He writes, "Hours before the dinner, we (Jacob and his fiancée) looked at each other and knew we needed one more person there. We had no other brothers, cousins or friends there, but we had Dan and will always have that memory together." He continues: "Dan is

genuine. He will drop everything at a moment's notice when you need help. He goes out of his way to make you feel welcome and has a way of letting you know how loved you are without even saying it." Regarding Dan's plea, Jacob knows Dan "…has already taken what he has learned, applied it to how he approaches business and life, and inspired others to do the same." Jacob's brother, Ryan, calls Dan his "second dad". Notwithstanding his legal situation, Jacob still knows Dan as an "awesome" person: "kind, loving, wise and funny man."

When he was fifteen, Luc Johnson, another one of Ben's friends, met Dan. Luc describes himself as "a shy kid that had just moved to the metro Detroit area and had a rough time getting acclimated to my new surroundings. . . .I received love and support in a very difficult time in my life, was given opportunities to learn and grow under Dan professionally and received a father-figure that I still lean on today nearly 16 years later. A lot of who I am is because of the guidance of Dan Israel."

Hiram Kyser's father worked for ASI. When Hiram was 13, he started going into work with his dad during the summers, and it was there that he met Dan Israel. Hiram writes, "I continued a relationship with Dan after getting out of college and would ask him for advice to better myself. He taught me so much on our travels through life. He is the hardest working person I know with a passion that promotes growth and success to be your best. He pushed me to be my best…". Many more

examples of Dan's influence on young people are found in the attached letters, which, in the interest of brevity, are not summarized here.

Dan was the person that friends sought out in their most difficult times, sharing their most intimate problems. Ronald Blank is one of these friends. He first met Dan as a customer of ASI, but like many others, developed a deep friendship with him. He writes "It is important that you understand who Dan became to me over these years…Dan was one of a very small group that I shared our families' darkest years when my middle son was struggling with addiction. We experienced overdoses, failed stints at rehab facilities and all that go along with a parent's worst nightmare… Dan was there every step of the way, calling me daily to check in, giving me the encouragement and support that I needed at a critical time. I am not sure how I would have survived this period without him." (Ronald's son has been sober for 5 years).

Ronald continues:

> … no matter what is going on in Dan's life (good or bad) he always has time to help a friend, always wants to hear what the other person is dealing with so he can offer help and show concern. Dan has always shown a true interest and concern for my family. I have witnessed this with how he helps other mutual friends. This, by the way, continued throughout the ordeal that Dan has been dealing with. He always, always put me and my family before what he was dealing with.

* * *

23

… I cannot emphasize enough who this man is to me, my family, and to others that are lucky enough to have experienced Dan either in business or in their personal lives. Dan is the most honest, trusting, and loyal person I have ever known. He has the highest degree of integrity…He is the truest and most trusting person (personally and professionally) that I have come to call a friend.

\* \* \*

…I can assure you that Dan took the position that if he . . . has done something wrong, he will deal with it head on. I am certain he has done everything possible to be fully transparent because that is they (sic) only way this man knows how to operate, he has lived his personal and professional life this way for as long as I have known him. I would trust Dan with every penny I have, with the health and safety of my family and those I love the most.

Ronald summarizes his feelings with the following words: "He has changed countless lives. My life is better, my family's lives are better because of this incredible person." *"I pray that you will consider the fact that Dan Israel is the best person I have ever known."* (Italics added)

Bruce Brickman has known Dan Israel "…since the day he went into business in the late 1980's stripping parking lots" and has worked with him on many projects over the years. He describes Dan as an incredibly hard worker and humble man. He writes, "Dan is very different than most people who have achieved this level of success. Dan does not drive a fancy car or live in an opulent mansion. Dan has forever driven a pickup truck, and I don't mean just for work. He . . . is simply a working man. Dan would wake up at 4:30am to get to work and be out on job sites … he was the guy who ran field operations and 'got his hands dirty'." Bruce writes

that if you asked Dan what his greatest success in business was, he would not talk about his financial success. Rather he would answer "that I have helped people around me rise to the best that they could be and that I have raised two great kids." In talking and spending time with Dan since the anti-trust violation became public, "Dan has expressed remorse and unlike others who would be in similar situations has never once complained or bemoaned 'why me'."

Dan is a very generous man, helping quietly, not looking for recognition. His friend Andrew Mila, one of his first customers in the paving business, writes:

> During the many paving jobs and on-site visits with his employees, I was privy to a lot of stories that his employees told me about Dan. This included general laborers, project managers, and vice-presidents. Many shared highly personal stories with tears in their eyes about how Dan had helped them out with personal situations, provided financial support to them and their family members who required assistance above and beyond their paycheck, and how he exhibited compassion and coaching that they desperately needed during dire straits. It does not matter to Dan what rank somebody is, he is always there to help someone in need, under the radar. Dan would always be one of the first to write a check to support a local charity event, however what strikes me the most is his anonymity in giving money and personal time to those people who desperately needed help in their personal lives.

Thomas Callan, who has known Dan personally and professionally for over 25 years, also wrote of Dan's generosity:

> Dan and his wife Cyndi are very charitable people. In business it is common to receive requests to support various causes and organizations. I often observed Dan and Cyndi support organizations financially, but I also saw how Dan would help organizations by fixing a damaged parking lot or provide services without charge. Neither Dan,

nor Cyndi ever sought recognition for such deeds, they just knew that helping people was the right thing to do.

In addition to the numerous acts of generosity already noted, helping countless employees with time and money, Dan has been active in many other charitable causes. His interest in mentoring young people led him to teach business classes in Detroit through Junior Achievement. He has given generous support to the Moonlight Community Foundation, a nonprofit that funds projects including sustainable food initiatives for the school district, affordable housing support and emergency services for those in need. He made the largest donation in the history of his alma mater, Denison University, in support of Women's Lacrosse. Dan is also a major contributor to The American Israel Public Affairs Committee (AIPAC), a bipartisan pro-Israel organization, and he actively fundraises for The Henry Ford Kidney Foundation. Dan hosted fundraisers and gave generously to the Mitchell Kiefer Foundation. Mitchell was a young man killed by a distracted driver, and the Foundation's goal was to end texting and driving. Due in no small part to Dan's involvement, this legislation was enacted in Michigan on June 7, 2023.

## Hockey and The Muskegon Lumberjacks Hockey Team

As amazing as those letters are, perhaps some of Dan's greatest contributions came through his involvement in hockey, where he not only helped hundreds of individuals, but helped revitalize the city of Muskegon. This all began when Dan's son Ben started playing hockey. To spend more time with Ben, Dan got his coaching

certificate and coached his son's team. When Ben turned 13, Dan realized that it was time for him to carry on without his father. Dan then took more coaching classes, ultimately getting a Level 4 certification which allowed him to coach at an elite level. All this work was in addition to Dan's "day jobs". He became a coach for the HoneyBaked AAA Hockey Team, the highest level of youth hockey. He loved coaching, and the opportunity it gave him to mentor hundreds of young people. Dan brought this same ethos to his involvement in hockey. It began when he was a "hockey dad", but evolved into a much bigger part of his life and those he mentored.

He loved the sport, but enjoyed coaching and mentoring even more because of the positive impact he could have on young players. Robert Kaiser was one of these boys. He credits Dan with helping the players "…develop into men both on the ice and off by teaching us lifelong lessons such as leadership, hard work, and compassion for others. Dan is the definition of a leader and the hardest working man I know… he knew the potential I had as a player before even I knew." Robert credits Dan with helping him fulfill his goal of playing Division 1 college hockey.

Robert Mainhardt's kids played hockey. Dan, knowing that his family was struggling, stepped up with support. Robert writes "Because of Dan, we never had to turn a young person away because their family could not afford it." He continues, "Dan is a pillar in my community. I will never be able to reciprocate all that he has

done for me and my family. I am one of hundreds, if not thousands of people who count on him and look to him in our toughest times."

Like everywhere he went, Dan made friends. Sean Schmidt's son also played for the HoneyBaked Hockey Team. When they first met, Sean asked Dan what he did for a living. In his humble way, Dan replied that he was a supervisor at a paving company. Mr. Schmidt writes, "I am currently a Project Supervisor for a large concrete construction company. I came up through the ranks as a union carpenter out of Detroit local 687. When I first met Dan, I was probably wearing bib-overalls and covered in mud and oil from work. To most people in the ice hockey community, I looked out of place with my attire (I usually had to take my son to practice or games directly from work.)"

Soon after they met, Dan and Sean started talking almost daily, usually around 5 am, because they "… were the only ones that seemed to be up at that time of the day going to work. We became very close friends during the early years of our boys' hockey journey." During winter months when concrete construction was slow, Sean did carpentry jobs for Dan. One of these jobs was a locker room addition at the Oak Park Ice Arena. Sean subsequently learned that Dan donated the cost of the project, something Dan never even mentioned. Dan also helped boys with donations to the HoneyBaked program. Sean writes "He also paid ice bills of families that could not afford it…I was only made aware of this because them families told me. Dan would

28

never speak of this to me." Sean credits Dan with helping him move "… up the ranks in the construction industry. I was always fond of his work ethic."

He continues,

"I can honestly say that in all my years I never thought that I would be friends with a person like Dan. I grew up in the downriver community to a single/divorced mother with no father figure in the picture. My friends were usually in the same home life situation as me. So, to meet someone from Bloomfield Hills that owned multiple businesses at the time we met was not normal to me. His acceptance of all different types of people is an admirable quality."

Sean concludes, "I am honored to say that I am a friend of Dan Israel and I hope the best for him, and his family and I know he regrets hurting anyone due to his actions."

Dan took his interest in hockey to the next level and, with a partner, bought a USHL team, the Muskegon Lumberjacks. In 2015, the Lumberjacks were playing in an aging stadium in front of sparse crowds and were on the verge of bankruptcy. They might not have survived had it not been for Dan Israel. An article in Muskegonsports.com stated that "The Jacks may not have survived to play the next season if Dan Israel had not purchased them at the last minute in August of 2015, just weeks before training camp.… he changed every aspect of the organization, for the better…"[3] Under Dan's leadership, the Lumberjacks qualified for the USHL

---

[3] *"Former Lumberjacks owner Dan Israel, the man who saved and greatly enhanced a once-troubled sports franchise"* Steve Gunn/MuskegonSports.com

playoffs for five straight seasons. His mission statement, put on display throughout the arena, was "To be the best junior hockey organization in the world, on the ice and off." Like everything else, it wasn't just about the sport, but about succeeding in life beyond hockey.

Head coach Mike Hamilton writes "I learned so much from Dan in regard to pushing myself, having a plan, having a budget and learning from the mission…In life and in business once you show Dan your effort and earn his trust, he gives you the rope to run with." To Coach Mike, Dan's emphasis on family was more striking than his professional goals. He encouraged Mike to include his kids in Lumberjack activities, and writes, "He is a family 1st person in his life and those who work for him."

Frank Zawrazky was a college student hoping to break into sports broadcasting when Dan gave him the opportunity to announce for the USHL. "As a young broadcaster just starting out in my career, I was looking for that first big break in hockey play-by-play. Dan gave me that and so much more." He continues, "Especially as a person with autism spectrum disorder, sometimes you need a little extra help to get your foot in the door. Dan Israel burst the door wide open for me, allowing me to blossom into the Mann (sic) and broadcaster I am today." After the Lumberjacks were sold, Dan helped Frank get a job with another team. "No matter what day or time it is… He doesn't just help when you ask for it, he is proactive in

4938-3505-5170, v. 1

his efforts to assist and check in. Being autistic, certain social situations are hard for me, especially in the business world. Dan Israel has helped me decipher countless situations to read them correctly. … I am so blessed and lucky to have Dan Israel in my corner, and anyone who works with him will for sure feel the same way."

Dan's contributions went far beyond the ice and into the city of Muskegon. As Josh Mervis, a co-owner of a USHL team, writes that the turn-around of the hockey team helped "…uplift the community through quality entertainment and civic pride." Through the Muskegon Lumberjacks Charitable Foundation, Dan funded and ran the Muskegon Reading Caravan. Andrea Rose, president of business operations explained that this program promotes literacy in Muskegon County. Players volunteer to go into schools where they read, talk about teamwork, and participate in other activities with the students. Over 20 schools and 5,000 students have benefited from this program.

The countless hours Dan donated to the kids and parents in the hockey community, and the good he has done for the city of Muskegon, simply cannot be overestimated.

Although the interest of brevity has clearly been violated in this memo (I hope for good reason) I would like to close with an excerpt from an extraordinary letter that captures the essence of Dan Israel. This letter was written by Christopher Goodwin, an employee at ASI:

He is a hero to many.

Dan has the ability to see a person's potential and has the interest or the desire to help the person achieve that potential. He saw mine, and he willed me to achieve it. He has done it for hundreds of other men. He believed I could succeed even when I didn't believe it…Please know I am one among hundreds. Dan is a man whose satisfaction comes from bringing other people up.

I was a newspaper and magazine editor for 18 years. I never had a dollar in savings during that 18 years. I am now a street sweeper operator with tens of thousands of dollars in the bank.

I was a drug addict for 30 years (assuming cannabis is a drug). I am now drug free.

I was a renter throughout my adulthood. I am now a home owner.

I was once a loser. I have become a winner. I was a man-child, a boy. I have become a man.

I owe this all to Dan.

Chris did not do well during his first season, and his supervisors didn't think he would make it. Dan spoke to him, saying "Chris, everyone who works here is a winner. You're a winner, but you're not acting like one." My response was emphatic: 'I think you have the unique ability to measure a man and put him in a position to reach his potential' "

Dan then asked Christopher about his relationship with his parents. "I told him that my father and I struggle to get along. I told him my mother was a witch. Dan said if you succeed here you'll turn that around 180 degrees. I don't know how he knew that. I don't know how it works. But before my first season ended, my

parents and I were closer than we have been since I was a child. We're even closer now 4 years later."

Many times that first season, I'd ask a co-worker, 'You like Dan?' and, to a man, they all responded without hesitation, "I love Dan." Many have told me how he helped them achieve some measure of success in life, overcome some addiction, reach some goal, improve their career trajectory.

> He takes people where they're at when he meets them, flaws and all, and grows them. He is a man of second chances. And third chances. And as far as I know, eighths chances. Tenth. Who knows how many times he'll give you a chance. I have never met anyone like Dan Israel. It is an honor that he knows my name. It is a privilege to have known him. Having worked for him is one of the great pleasures of my life."

When Chris told Dan how he had provided for hundreds of workers and their families, "…he blushed. Don't say I did it. ASI did, maybe."

The above excerpts are only a sampling from the letters written about Dan and who he is. They are, taken as a whole, a remarkable testament to a remarkable man. I hope they will assist the Court in gaining further insight into Dan Israel, because I believe that a true picture of his life and work, if justice is to be done, must inevitably stand him in good stead.

## A Dedicated Family Man

Many employees, colleagues and friends have also written about Dan's focus on his family. Dan and his wife Cindy have been together for 40 years and married

for 37 years, ever since the time Dan was struggling to get his business off the ground. She worked outside the home until their children were born. She writes "It feels like we have been living with an insurmountable problem." Mirroring Dan's positive attitude, she continues, "But, we are now coming to the end of the tunnel and hopefully there will be light at the end." She writes of how he has taken complete responsibility. "…Dan hasn't made any excuses – not one! He has faced the problem, told people what he did, told people never to do what he did, and has never once shied away from or made lame excuses for what he did." She, like so many others, cannot help but admire his empathy, compassion and dedication to his employees, writing, "Yes, Dan was a successful businessman, but there are a lot of successful businessmen that I know in our community, who don't worry about anyone else but themselves. This is not who Dan was or is." "Dan is a believer in the American dream, he is someone who worked hard and has been successful. But he has never forgotten where he came from, how lucky he is, and how important it is to try to help others reach their own level of success." Taking care of people and helping others is part of Dan's DNA. And despite this success and talent, "… that is not what defines Dan. What defines him is his family…" and as Cindy has told me, "I love Dan more and more each year, he is my rock, and sole provider."

Their son Ben, 31, lives in Detroit and works with his dad in the real estate business at BOS Capital. Their daughter Leah, 29, works in technology sales and

lives in San Francisco with her husband. In spite of his long hours at work, Dan was always there for his kids. Ben played hockey, and writes "… my dad never missed, and I mean never missed, one game in my 20-year hockey career. I'm not exaggerating. From 5 years old through my entire college hockey career, he never missed one game, either in person or on TV." Leah writes that "…despite his demanding workload, he always prioritized being there for dinner & a goodnight tuck-in, attending every single sports game, celebrating every birthday and holiday, and witnessing every graduation. Yet, he didn't just show up; he was fully present, engaged and actively involved." Ben describes his upbringing. "First and foremost, let me say I am incredibly blessed to have a dad like him. Throughout my entire life my dad has been a consistent source of guidance and wisdom for me, and even when I failed to appreciate it (particularly as a teen) his guidance never wavered. My dad has always been the type of leader to "walk the walk" and back up his leadership with actions... He is not hypocritical with the high standards he sets for us because he sets and meets those same standards himself."

Leah and Ben were taught never to take their privilege for granted. As Dan's brother Marc writes, "Dan was always supportive, but never 'coddled' his children." Leah writes "At a young age, my brother and I were taught the value of hard work for personal development, confidence and growth." They were both expected to work from the time they were teenagers. Leah worked at retail stores, babysitting,

and waitressing. Ben worked on his father's work crews, and writes, "From an early age I started working sweeping the garage floors and cleaning up the oil spills with the truck mechanics at Asphalt Specialists Inc. . . . my Dad made it very clear to whoever I was working with, I was to work harder and longer due to the position I was in." Dan repeatedly told Leah, "...you can always outwork the other person, something which has stayed with me forever and, a trait which no one can take away." In addition to working, the kids engaged in volunteer activities such as working at soup kitchens and coaching sports in disadvantaged communities. Leah writes "Generosity and community engagement are integral aspects of his life and it is an example my brother and I strive to follow."

As you have read in many letters, Dan always treated everyone the same and displayed this ethic to his children. They are understandably especially proud of the influence their father has had on so many people. Leah writes, "His impact on every person, place or thing he encounters is undeniably positive. ...he knows how to find joy in everything, spread happiness wherever he goes." She sees the "remarkable quality" her dad has to "make everyone around him feel special."

Dan has shared with his kids his deep remorse, not only for the offense, but for the pain and embarrassment he has caused everyone to suffer. As Ben writes, "I can assure you that no matter what the result of his sentencing, there is nothing more painful about this punishment than the pain my Dad has already endured knowing

that he hurt his family and caused so much stress, but also because he simply did not do the right thing, which he always taught us to do."(Letters from other family are also attached).

Dan's family life speaks volumes about him as a father and as a person. Indeed, he shoulders great shame because of the disappointment, hurt and embarrassment he has caused everyone. Yet, his marriage remains unshakeable and his relationship with his children remains extremely close. While family ties were not ordinarily considered under the mandatory Guidelines, they are circumstances that §3553(a) authorizes this Court to consider. *United States v. Prosperi* 686 F.3d 32 (1st Cir. 2012). As a practical matter, it is clear that his family, and society as a whole, will benefit far more from Israel's presence in the community than his incarceration.

As the Court knows, a single fact pattern can support and fit into more than one legal variance compartment, for example, in *U.S. v. Pauley,* 511 F.3d 468 (4th Cir. 2007) the sentencing court varied in part, because the defendant was deeply remorseful and he was a good father and teacher. The appellate court found such considerations were appropriate as they are directly tied to § 3553(a)(1)'s directive that the court consider the history and characteristics of the defendant. It is beyond dispute that Dan is a good parent as is evidenced by all the wonderful letters from family and friends. (See Attached Exhibit "A")

4938-3505-5170, v. 1

The strong family support he has continuously given and in return received from his family, friends and work associates has also steadied him through this personal crisis and will aid him in continuing to be a productive citizen. The Guidelines fail to take into account such support, but Dan asks the Court to recognize the value of this dynamic since strong family ties alone have also been recognized as a legitimate basis to vary downward. *U.S. v. Sayad,* 589 F.3d 1110 (10th Cir. 2009); *U.S. v. Smith,* (4th Cir. April 22, 2008) 2008 WL 1816564 (unpub.); *U.S. v. Wachowiak,* 412 F.Supp.2d 958 (E.D. Wisc. 2006), aff'd 496 F.3d 744 (7th Cir. 2007).

## A Successful Businessman

Dan's entrepreneurial skills were apparent from an early age, ever since he started a parking lot striping business with his brother. The rest of his business history is one of remarkable growth and achievement.   One reason Dan, and in turn the ASI companies were so successful is the team he had around him. Dan has always treated everyone with respect, regardless of their position or their race, color, creed, education, or gender. He inspired and encouraged professional advancement for his employees, governed ASI's field operations with integrity and tried to strictly adhere to his belief in his fellow man.

Even as the criminal investigation surfaced, Dan Israel continued his dedicated service, and did not sit idly by but did his very best to continue to lead the

38

ASI businesses. As a result, even after his departure, he has continuously received scores of calls from employees asking when he was going to return, telling him that he was sorely missed, and that ASI was not the same place without him. He has continued to provide others with advice and mentoring to the very date of the writing of this memo. One of Dan's goals it to continue to help anyone who asks for his help and to meaningfully and positively contribute and give back to society.

### A Remorseful Man Who Let Down Those He Loved and Cared About

Dan has, from his earliest meetings with Counsel, consistently and unhesitatingly taken responsibility for the crime he committed; and, while the Court may not be personally touched by it, his remorse for violating the law is overwhelming. I have spent scores of hours talking with Dan about his situation, and he has repeatedly told me how sorry he is for what he did for so many reasons, including for the broad range of innocent folks who were hurt by his actions.

Your Honor, as you can see from the unprecedented volume and breadth of the letters, Dan is a special person. One need only spend a short time with him to realize what type of really unique person he really is: a man who is at base someone who is always willing to go out of his way to try to help others, a simple but admirable quality that too small a segment of today's society possesses. He is the type of guy that you wish you could return the favor to; the kind of guy that if you need help in an emergency, you call Dan; if you need to talk, you call Dan; if you

need advice, you call Dan. He is someone who wears his heart on his sleeve, who does what he does and doesn't ask for anything in return. He does it because doing good makes him feel good, and because he loves helping others. Dan is the guy who is always there for people "during those difficult moments," no matter what sacrifice he has to make on a personal level. He does it, matter of factly, anonymously, and without fanfare, and without seeking an "atta boy". This alone sets Dan apart from a large part of humanity.

What is especially gratifying to Dan is that the letters submitted on his behalf were written by so many different people, from so many walks of life, who took time out of their schedules to write in their own words, on his behalf. Indeed some of the writers are the very same people he feels he disappointed the most; people who know that he has admitted his guilt and yet still describe him in glowing terms, and wish they could continue working with him. Whether they heard it directly from Dan, or from the press (and there was a ton of it with pictures of Dan prominently posted), or from "the street," the reaction was always the same – shock and disbelief. Nonetheless, Dan is still held in high regard as someone who has admitted his wrongdoing and someone who is still trusted and considered a man of high integrity because these mistakes in his life do not define the person that they came to know and trust over many years. It is what a man does when faced with such a situation that defines him and from their viewpoint Dan passes with flying colors.

4938-3505-5170, v. 1

## The Offense

Yet, in spite of all he has accomplished, Dan finds himself before this Court to address his conduct and its impact on the community. As the Court might surmise, this case has created a huge burden and stress on Dan and all who care about him. Dan has always tried to do the right thing. But to err is human, and Dan is human. He is an exceptional human being, but far from perfect. He told the Court during the plea proceeding, he did not know he was committing a criminal offense, but as soon as the facts and law were explained, he immediately accepted responsibility and admitted what he did. As Your Honor weighs the appropriate sentence for Mr. Isael, I offer these additional observations for the Court's consideration.

### A Downward Variance Is Warranted Because the Volume of Commerce Overstates Mr. Israel's Involvement in the Conspiracy

Mr. Israel's Rule 11 Plea Agreement contains a stipulated Volume of Commerce ("VOC") of $22,315,512, which covers the entire period from March 2013-May 2021. Daniel Israel pled guilty to a conspiracy with one company—Al's Asphalt—which lasted from March 2013-November 2018.

The VOC, which is a concept used in the Sentencing Guidelines for antitrust crimes, does not reflect losses were incurred by ASI's customers or profits that were derived by ASI from illegal activity. *See* U.S.S.G. §2R1.1 commentary (background) ("The offense levels are not based directly on the damage caused or profit made by the defendant. . . ."). As opposed to any harm to the customer, it

41

instead reflects the total gross revenues ASI derived from winning bids that were affected by the actions taken by Israel and his co-conspirators, including conduct beyond ASI's conspiracy with Al's Asphalt.  The stipulated VOC includes bids where Mr. Israel was directly involved in complementary bid-rigging, which collectively amount to less than $5 million in gross revenue for ASI.  The stipulated total VOC also includes bids that were coordinated by Mr. Israel's co-conspirators without his knowledge or involvement.

As to the latter category, Dan first learned that those bids were subject to unlawful activity as the result of extensive meetings and discussions with the Government (including a reverse proffer).  Mr. Israel was shocked when he first learned that his co-conspirators had coordinated bids for these jobs.  Indeed, until these interactions with the Government, he had no idea that anyone at ASI had coordinated bids with Allied (a separate conspiracy for which he was not charged, and for which he has not pleaded guilty).  And he was stunned to learn that his co-conspirators had actually coordinated bids for a large job after ASI was sold.

While Counsel acknowledges that the Guidelines sentencing range for antitrust crimes is unique because it is based on the VOC instead of actual financial losses or harm, Counsel respectfully submits that this is a case where that VOC could lead this Court to impose a custodial sentence that is not proportionate to the offense Mr. Israel committed.  This is so because this is not a case where the defendant's

Guidelines range reflects only "the volume of commerce done by him or his principal in goods or services that were affected by the violation." U.S.S.G. §2R1.1. Instead, the inclusion of other relevant offense conduct—much of it undertaken by Mr. Israel's co-conspirators, without his knowledge and agreement—increases the VOC substantially. Mr. Israel nonetheless stipulated to the VOC in his plea because he wanted to accept responsibility and make amends for his conduct, in spite of his lack of knowledge of all his co-conspirator's actions.

Given his more limited direct involvement in the conspiracy and the breadth of his co-conspirators' actions that were undertaken without his knowledge or involvement, Counsel respectfully submits that a downward variance from the Guidelines range is warranted here. In determining his sentence, the Court must consider, among other things, the nature and circumstances of the offense, including the defendant's involvement, and the need for any sentence to provide "just punishment". Counsel submits that a downward variance from the Guidelines range is necessary to impose punishment that would be "just," in light of Mr. Israel's own actions, his steadfast efforts to make amends and his unwavering acceptance of accountability/responsibility.

As Dan's attorney, I am acutely aware that any attempt to frame the VOC and breaking it into its component parts, as well as any arguments in connection with an explanation of how Dan has come before the Court could be viewed as making

excuses or attempting to minimize his conduct. It is not. But, when considering the nature and circumstances of the offense, I believe it is important to consider Dan's direct involvement in the conspiracy, as well the total scope of the conspiracy in light of ASI's overall business. Dan was just one of many co-conspirators, each of whom had a different degree of direct involvement in the complementary bidding. And, to be clear, Dan has never wavered in his commitment to accept responsibility for his involvement.

### His Work Ethic, and Employment History

Dan has boundless energy and laser focus. The one characteristic about Dan Israel that nobody can quarrel with is   he is a tireless worker and someone who always gives 100%. If he was awake, he was on the go working alongside his fellow employees in the field, thinking about how to improve the company, whether it be its services, solving equipment or healthcare issues, or simply how to better serve customers in the field. And it is beyond cavil that ASI business did not suffer one bit during his tenure because he was such an amazing field general and put client services above all else. That work ethic still continues in his recent endeavors, BOS Capital ("BOS") and Second Chance Capital LLC.

Dan Israel has held full-time employment his entire adult life. There is nothing exceptional about that claim in and of itself, however Dan's definition of fulltime work is not a mere 40-hour week. he commonly started at 5:00 a.m. and ended at

8:00 p.m. (with interruption for family events), and that is when no emergencies were extant. When not at ASI, he was constantly interacting with employees and available to address their concerns. His phone was always on, and he was always available to work through or solve any problems that arose at work even if he had to leave home or get out of bed to do so. Israel has literally held some kind of job or worked in one capacity or another since he was a young man. His work history, from 1985 forward, is outlined at ¶70-71 of the PSIR, but it does not identify the myriad jobs he worked before then which have already been outlined for the Court.

Nor has Dan sat idle since he came under investigation, pled guilty, and lost his job with ASI. Rather, he threw himself headlong into developing a new real estate business, BOS Capital, with offices in Southfield, Michigan.  In short order, he turned it into a productive venture with real estate assets in Ohio and Michigan. Due to his talent and no-nonsense approach, he is helping to grow the business (which is in the commercial and apartment leasing space) from scratch.  It is on track to be a successful and long-lasting entity as it conducts market studies and searches for suitable investments in which to allocate capital.  It is a full-time job and BOS now has six people on staff including Dan, and is continuing to grow.

A long history of full and gainful employment provides an appropriate basis for a downward variance. In *U.S. v. Jones,* 158 F.3d 492 (10th Cir. 1998); *U.S. v. Alba,* 933 F.2d 1117 (2nd Cir. 1991); *U.S. v. Jagmohan,* 909 F.2d 61 (2nd Cir. 1990)

and *U.S. v. Big Crow,* 898 F.2d 1326 (8th Cir. 1990); (each court considered granting a variance in part based on a defendant's employment history). Thus, Israel asks this Court to consider his employment history as a basis for downward variance from the Advisory Guidelines. *See, U.S. v. Ruff,* 535 F.3d 999 (9th Cir. 2008); *U.S. v. Baker,* 443 F.2d 987 (7th Cir. 2006).

## DAN HAD NO RECORD WHATSOEVER

As also reflected in the PSIR but worth reiterating, Dan has no criminal record or history whatsoever, no felonies, no misdemeanors. He has never had a charge delayed, deferred, taken under advisement, or expunged. He has never been arrested or formally sanctioned or disciplined in any setting. As the U.S. Sentencing Commission has opined, and as is relevant here, the Guidelines now affirmatively reflect the general appropriateness of imposing a sentence other than imprisonment in cases such as this.

Dan now has a criminal record and will be branded a felon for the rest of his life – no small thing. Indeed, criminal convictions have lifelong ramifications, and affect defendants in different ways; some blame others; some continue to deny or minimize their behavior, some blame the government for overreaching or for singling them out, others accept the responsibility as a cost of doing business and are not affected in the least, and some, are truly repentant and pose no risk of recidivism. Dan clearly falls in this last category. As difficult as it is, he has come to

46

grips with what he did was wrong in spite of how he sees himself. And, while he did not live up to his own high standards, which people came to expect of him and he expects of himself, he is, as the Court would expect, embarrassed, humbled, and repentant, both personally and publicly. Indeed, as Dan told me "I wish I could undo it, but I can't. I have let down my friends, family, and employees because of my actions. I wish I wouldn't have, but I did." He will appear before the Court ready to settle his debt with society.

Another thing the Court can glean from all the attached letters is that Dan is one of those unique individuals who radiates positive energy. He hardly has the profile one would expect of a criminal defendant. Rather, he has an almost childlike curiosity that makes him interested in helping everybody around him. That is one of the qualities which earned him the respect of those who know him, or worked with and for him. Dan is like the teacher who expands a student's academic potential or a coach that gets an all-star performance out of an average player. As you have read, he was accessible 24-7 (literally) to his co-workers, his employees, always encouraging them to take on new challenges and, whenever possible, mentoring them through the process.

These letters detailing his history and character leave no doubt that despite the offense at issue Dan Israel is at his core a good, decent, and compassionate human

being. His is a lifelong commitment to principles that cannot be feigned as a mere foxhole conversion.

### This Court Should Consider a Downward Variance as Israel Waited an Extremely Long Period of Time to Commit His First Offense

Israel's age was not "ordinarily relevant under the former sentencing regime, but it is now clearly relevant as a basis for variance," U.S. *v. Davis,* 458 F.3d 491 (6th Cir. 2006). (*See* pp. 30-31, *Infra.*) Israel, who is now 63 years old, had an unblemished record for the first 60+ years of his life. *See U.S. v. Fuson,* 215 Fed. Appx. 468 (6th Cir. 2007) (recognizing that a defendant properly received a variance in part because of an unblemished record for the previous seven years); *U.S. v. Smith,* (4th Cir. 2008) 2008 WL 1816564 (unpub.).

The rationale is that someone like Israel who does not engage in any criminal activity until much later in life statistically has a much lower risk of recidivism. See, *Davis,* 458 F.3d at 504 (2006) (J. Keith dissenting). Not only do statistics support the proposition that he is unlikely to recidivate, Israel's life history, personal characteristics, and the situational nature of the instant offense strongly support the point as well.

### Israel Should be Granted a Downward Variance Given His Character and Good Works

A variance is merited in the instant case given Israel's background, age, personality, personal history, characteristics and community efforts. Stated another

way, one's character and positive characteristics, such as having no history of substance abuse, no sociopathic or criminalistic mind, etc., all militate in favor of a below Guidelines sentence. *See, Autery, supra.* Israel's characteristics constitute a rich history of good deeds and justify a variance, s*ee, U.S. v. Cooper,* 394 F.3d 172 (3rd Cir. 2005) (variance was warranted because of good works, and because of "hands-on personal sacrifices which have a dramatic and positive impact on the lives of others").

Israel's reputation for helping others is obviously well deserved. It is not something he strives to receive recognition for, but he has such endless energy such that he would rather be working, volunteering or doing something to help somebody, rather than wasting time. That aspect of prison time is simply antithetical to his nature.   In fact, he has also recently launched another business venture named Second Chance Capital LLC ("SCC").   SCC was formed by Dan Israel and his partner on December 10, 2024. SCC is a financial services firm dedicated to providing access to debt and capital for individuals who face significant barriers due to a past felony conviction or incarceration. It was an idea that Dan developed as a result of the difficulties he personally experienced as the result of this case.   But unlike many who were in a similar situation, Dan is trying to do something positive to help others to overcome this significant obstacle. SCC's mission is to reduce recidivism rates by offering pathways to financial stability through business

49

ownership and economic empowerment. The entity will seek to provide mentoring and consulting services as well as debt and equity funding options to those whom society has overlooked or given up on, such as those with a felony record, empowering them to achieve financial independence, business success and stability.

### A Custodial Sentence is Not Necessary Given the Level of Israel's Acceptance of Responsibility, Remorse, Efforts to Cooperate With the Government, and His Unique Personal History & Characteristics

Remorse is a factor already taken into account by the Guidelines under acceptance of responsibility. Still, it is a permissible factor for a departure/variance if it is present to some exceptional degree. This is true even where credit has already been given for acceptance of responsibility. *See, U.S. v. Fagan,* 162 F.3d 1280 (10th Cir. 1998). Thus, remorse beyond that exhibited via a plea warrants consideration as a variance factor.

Israel expressed his genuine remorse and contrition and an understanding of the harm he caused in many different ways including his cooperation and his communications with others to avoid his path. His conduct subsequent to his awareness of the investigation further demonstrates his complete acceptance of responsibility. He immediately cooperated with the agents, has trumpeted his desire and belief that he should immediately plead guilty, proffered to the Government, and fully exposed himself and explained his involvement in this activity. His conduct

50

goes far beyond what is required under the Guidelines for a reduction for acceptance of responsibility.

In *Williams v. New York,* 337 U.S. 241 (1949) the Supreme Court recognized that a defendant's admission of responsibility or expression of contrition is often a significant step toward rehabilitation and for that reason deserving of a possible reward in the form of a lesser sentence. Indeed, as Justice Powell once wrote referring to a cooperating defendant:

> Few facts available to a sentencing judge are more relevant to the likelihood that (a defendant) will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, (and) the degree to which he does or does not deem himself at war with his society. *United States v. Hendrix,* 505 F.2d 1233, 1236 (2nd Cir. 1974).

Israel has demonstrated that he is totally at peace with society. He has exhibited remorse for his conduct and expressed his desire and willingness to cooperate with Government investigators to do what he can do to make amends.

### A Non-Custodial Sentence Will Satisfy Adequate Deterrence As Israel Has Personally Lost Far More Than Any Financial Harm Caused By The Company

The two species of deterrence, general and specific, call for separate analyses. As for general deterrence—the need to fashion a punishment which will deter the public at large from taking the same course of action as the defendant -- it is reasonable to conclude that a sentence, even one below the applicable guideline

range would serve as a significant disincentive for others who might otherwise be tempted to engage in similar conduct because of all the reasons discussed. This is so because there "is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson,* 441 F.Supp.2d 506, 514 (SDNY 2006) Richard Frase, Punishment Purposes, 58 Stanford Law Review 67, 80 (2005)

Some judges have recognized that there is no empirical proof, or any proof at all for that matter, that a lengthy prison sentence leads to greater general deterrence of white collar type crime generally. *See United States v. Yeaman,* 248 F.3d 223, 238 (3rd Cir. 2001) (Nygaard, J. dissenting) ("It is widely recognized that the *duration* of incarceration provides little or no general deterrence for white collar crimes."). Research to date generally indicates that increases in the *certainty* of punishment as opposed to the *severity* of punishment are more likely to produce deterrent effects.[4] In fact, the research suggests that indictment and conviction alone have a far more significant and adequate deterrent effect on individuals who place a high-value on their personal reputation, which Israel clearly does. In addition to being branded a felon for life, there have been literally ten-plus articles in the newspaper and online,

---

[4] "Deterrence in Criminal Justice, Evaluating Certainty Versus Severity of Punishment," Valerie Wright Ph.D., Nov. 2010. (Research Analyst at the Sentencing Project)

4938-3505-5170, v. 1

many of which contained Dan's (and only Dan's) photo displayed for the public to see. This scarlet letter is a much greater deterrent to the average businessman than hearing, for example, that Tim Baugher received 6 months CAG, or whatever custodial sentence the court might have been considering for Dan prior to the review of all of the sentencing materials submitted to the Court.

Counsel recognizes that "[c]onsideration of general deterrence is particularly important where the district court varies substantially from the Guidelines," *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014), but in this case, a downward variance for Mr. Israel would not undermine the policy considerations related to general deterrence.

While Mr. Israel has been tremendously successful in business, his personal wealth was not built through criminal conduct. Dan started his business at the age of eighteen, without any outside financial support, including from his family. Working with his brother Bruce, they striped parking spots until they had scraped together enough money to buy equipment that they could use to pave small parking lots. Over time, they purchased larger equipment and expanded their business. Most notably, they acquired and Dan operated two large trucking companies (Lou's and TKMS), which hauled and delivered stone, aggregate, and other construction materials. By 2019, their total business (including ASI, Lou's and TKMS) was generating approximately $150,000,000 in annual revenues (including almost

$50,000,000 in annual revenue from trucking operations), and the businesses employed approximately 400 people.   That success was hard-earned, through significant personal sacrifice that was sustained for decades.  Mr. Israel worked 14-hour days during the "paving season" (between April and December), including on weekends, when Mr. Israel spent his Saturdays overseeing crews that were paving large projects in the summer heat, while Sundays were spent doing administrative work.

Simply put, ASI was not a criminal enterprise—far from it.  The total VOC reflected in Mr. Israel's plea agreement constitutes 2% of the gross revenues earned by the ASI companies during the entire 2013-2021 time period.[5]  ASI was (and still is today), a legitimate business, which the Israel brothers grew from nothing into a large organization that has hundreds of employees.   In the process, Mr. Israel achieved great personal success, but that was the result of hard work, saving, and prudent investing—not the actions that bring him before the Court now.

Mr. Israel dedicated the majority of his adult life to building the ASI companies into successful businesses, and he has already lost far more, both

---

[5]The ASI companies' total gross revenue from 2013 through 2021 totaled $1,108,210,408. Of this, VOC totals 2%. The total bids during the same 2013-2021 time period was 16,037 jobs. The total impacted bids is 41. The total percent of impacted bids is .26%. The total bid value for that same time period is $3,458,335,200 and the total VOC was $23,465,115, for a .68% value. If one uses VOC for the AI's conspiracy (and any related offense conduct) alone, to which Israel pled guilty, the percentage is far lower.

personally and financially, than any financial benefits which he could plausibly have obtained from the conspiracy.   Assuming arguendo ASI's paving business (typically) earned average margins of about 10% on each job, translates to approximately $2 million in profit for ASI, over a period of eight years, for the total VOC described in Mr. Israel's plea. Even if that entire amount of profit is attributed to the conspiracy (and it should not be), that is at most $250,000 per year. And from those profits, Mr. Israel would have personally retained only a portion, in terms of his own compensation.

Mr. Israel has undeniably already suffered significant consequences that far outstrip the the benefits he could have received from the conspiracy, confirming the adage that "crime does not pay!" He was fired from ASI and lost his income from the company. The private equity owner of the company clawed back his remaining ASI stock, which was valued at approximately $12 million. He will pay a significant criminal fine.   And his reputation has been irrevocably damaged in the local community. Mr. Israel, as the first employee from ASI to agree to plead guilty— even before the company—was referenced every time the Detroit press ran a story related to anyone connected to the investigation, his name was prominently mentioned, and his picture was featured.

Thus, in addition to heavy financial losses, Dan has been publicly and repeatedly been branded as a felon, he has lost his standing in the community, and

he recognizes there is a long road ahead to attempt to rebuild the trust and reputation that he worked so hard to earn. The collective impact of these real-world consequences serves as a significant deterrent and notice to others who may otherwise be tempted to break the antitrust laws. A downward variance from the Guidelines range, therefore, will not undermine policy considerations with respect to general deterrence.

As for specific deterrence, as the Court can see from all the facts and circumstances, including how he has conducted himself before and after the investigation began, the public does not need any protection from Dan. He presents absolutely no risk of recidivism. His age, character, and the unique and specific combination of factors discussed above reinforce the claim. Incarceration, particularly at this point in his life, is not warranted nor is it necessary. The stigma of a felony, the significant and widespread press this case has received, and Dan's public discussion of it, has had a significant and adequate deterrent effect on the public.

The Supreme Court has accepted that the "deterrence message" can even be sent through a sentence of probation.[6] *See, Gall v United States,* 552 U.S. 38 (2007); *Kimbrough v. United States,* 552 U.S. 85 (2007)*. Gall* specifically recognized a

---

[6] Given the similarity between Supervised Release and Probation, Israel makes this supporting argument utilizing probation cases.

sentence of probation results in a substantial restriction of freedom, and that although "custodial sentences are qualitatively more severe than probationary sentences in equivalent terms, offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty including…" This Court can impose any specialized condition that it deems appropriate in light of §3553. While Israel does not contend that a sentence of "straight probation" would entirely fulfill the deterrence message in this case, as he is not so naïve to his reality, he respectfully contends that this sentencing objective does not make BOP incarceration inevitable.[7]

Indeed, supervised release, with conditions, can constitute onerous punishment and a sufficient supplement to a sentence under 18 U.S.C. §3553. Here, the Court can add to this deterrence assurance by placing Israel on an extended period of supervised release (with stringent conditions and custody sanctions) in addition to any conditions of sentence. In support of this proposition, *U.S. v. Stahl,* 581 F.3d 276 (6th Cir. 2009) (where the Guidelines were 57 – 71 months) found a district court's sentence of one day in jail with ten years' supervised release and one year house arrest was not unreasonable. Obviously, any failure by Israel to follow the law will allow this Court to impose additional and significant prison time. This, in and of itself, constitutes a built-in additional deterrent.

---

[7] There are numerous conditions this Court can impose as part of a sentence of supervised release, in addition to incarceration. *See,* U.S.S.G. §5B1.3.

### Israel's Post Offense (Rehabilitative) Conduct and Efforts Toward Making Amends for His Conduct Demonstrate That He Has Already Been Deterred and Rehabilitated

Perhaps one of the strongest indicators of a defendant's rehabilitation, or potential for rehabilitation, is post offense conduct. The case of *Gall, supra* is instructive in this regard since it involved post-sentencing rehabilitative conduct on the part of the defendant. The Court noted that, "[t]he District Court quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative. This also lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts." 552 U.S. at 59. Dan fits within the Court's reasoning, and has continued on his own to be just that person. He didn't miss a beat and transformed himself, ceased his conduct prior to others charged, and started new businesses.

As the result of his guilty plea, Dan is no longer at ASI but immediately on his departure created full-time employment for himself and others at BOS Capital where his work ethic and knowledge have continued to produce positive results. In fact, one of the most important requests that can be made of this Court, would be to allow him to remain in the community to allow Mr. Israel to continue his employment and develop Second Chance LLC in order to help others. (See p.51)

## The Public Does Not Need Further Protection From Dan Israel

A recognized goal of sentencing is to protect the public from further crimes of a defendant. 18 U.S.C. §3553(a)(1)(C). Here, imprisonment is not necessary to achieve this goal as there is no reasonable likelihood that Dan Israel will reoffend nor is he a risk of harm to the public. Except for the instant conduct he has an exemplary background and his conduct since the offense points only to a productive and law-abiding future. Thus, Israel hopes the Court will agree he poses absolutely no danger to the public, and a sentence of incarceration is unnecessary to achieve specific deterrence. Indeed, such a sentence would be greater than necessary to address this §3553 factor.

## Israel Presents Absolutely No Risk of Recidivism[8]

Various courts have found that older defendants present very low risks of recidivism and that they are very unlikely to reoffend and, therefore, pose no danger to the public. *U.S. v. Cherry,* 47 F.3d 366 (6th Cir. 2007); *U.S. v. Smith,* ___ F.3d ___ (2008 WL1816564) (4th Cir. 2008) (unpub.).

It is generally recognized that defendants (such as Israel) "over the age of forty … exhibit markedly lower rates of recidivism in comparison to younger defendants." *U.S. v. Waldena,* 490 F.3d 735 (8th Cir. 2006); see *Measuring Recidivism:* www.ussc.gov/publicat/RecidivismGeneral.pdf, (recidivism rates decline relatively

---

[8] A related concept to that just discussed.

consistently as age increases," from 35.5% under age 21 to 9.5% over 50). This empirical fact alone militates strongly in favor of a below guideline sentence.

Dan Israel is 63 years old. Although he is not elderly, particularly in this day and age, his age and the specific and unique combination of factors which led to this offense -- which have now been eliminated, makes him statistically unlikely to reoffend.   Dan is a strong person, both mentally and physically however, I would be remiss if I did not at least tell the court that his body is beginning to breakdown. Dan suffered from what could have been a fatal disease, kidney cancer, had it not been so timely diagnosed.   As a result he had to undergo a nine-hour surgery, which by all accounts was successful.   Dan now has to have follow-up screens every six months in order to catch and treat it, if the cancer returns.   More recently, he had another serious health scare which required prostate surgery on April. 22nd, 2025. That surgery likewise produced good news and was deemed a success.     Dan is determined to recover from that surgery and be ready for sentencing on May 22nd.

### Need to Avoid Unwanted Sentencing Disparity

Since each offender and case is unique, it is difficult to make exact comparisons; however, Israel is not unmindful of this Court's prior sentencings in related cases, particularly in the Edward Swanson and Tim Baugher cases and will address this issue in greater depth at allocution.

4938-3505-5170, v. 1

## Conclusion

Dan wants to avoid any incarceration because he needs, and desperately wants, to continue developing his businesses and in the process, to help others who need his help.   Prior to *Booker,* this Court would have been constrained by the Guidelines in fashioning an appropriate sentence. Now, however, the Court can consider a wide variety of factors and must respond to a number of concerns that are unique to Israel. In the past, it seems that those concerns primarily surrounded punishment and deterrence. Now, however, the Court can consider even previously disallowed factors in fashioning Israel's overall sentence given the dramatic change in the considerations of sentencing.

In the wake of *Booker,* this Court can now give appropriate weight to numerous relevant factors via a variance analysis (something which it would have been constrained from doing prior to 2007) including, just to name a few: (1) his good works in the community; (2) his age; (3) his lack of any prior criminal history; (4) his acceptance of responsibility; (5) the collateral consequences he has suffered and will continue to suffer; (6) the significant financial losses he has suffered; (7) his family circumstances and background; (8) his employment record; (9) his post-offense conduct, and rehabilitation; (10) the fact that the VOC overstates the seriousness of his role in the offense; (11) his excellent PSI; (12) his conduct on pre-trial release; (13) he poses no danger to the community; (14) he will not recidivate;

(15) his cooperation and immediate acceptance of responsibility; (16) his payment of all fines and costs; (17) the lack of any need to make restitution payments; and (18) the stigma of his felony conviction. All these 3553(a) factors militate strongly in favor of a downward variance.

Finally, in some overall way, I feel Dan's life and his exemplary good works and the help he provided to so many, in some basic way should be considered and that is only fair to set off against one's mistakes the kind of conduct which have won the affection, respect, and admiration of those that really know him.  In cases like this, the Court has the unique ability to fashion a message to balance the goals of sentencing because that is what the law requires. Whatever message this Court decides to send pursuant to 18 U.S.C. §3553, the Court should be aware, Israel is committed to continuing to be of service to his family, his community and his country.

As the Supreme Court noted in *United States v. Gall*, 552 U.S. 38, 52 (2207) quoting its earlier opinion in *Koon v. United States*, 518 U.S. 81, 113 (1996), "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

Thank you. Mr. Israel and I stand ready to answer any questions the Court may have at sentencing.

Sincerely,

Walter J. Piszczatowski

WJP/fvs
Ruben Martinez, Jr., Esq. – Via Email – DOJ Antitrust Trial Attorney
USPO Katelyn A. Aquirre – Via Email
Michael Loterstein, Esq. – Via Email – DOJ Antitrust Trial Attorney