UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA

        v.

DANIEL L. ISRAEL,

               Defendant.

Criminal No. 2:23-cr-20538

Hon. Gershwin A. Drain

## UNITED STATES' SENTENCING MEMORANDUM FOR DANIEL L. ISRAEL

Defendant Daniel L. Israel (the "Defendant"), co-founder and former majority owner of Asphalt Specialists LLC ("ASI"), cultivated and directly participated in ASI's bid-rigging relationships, both in the charged conspiracy and in uncharged bid-rigging conspiracies, for at least half a decade.  The Defendant's participation in these conspiracies enabled ASI to win more than $22.3 million in asphalt paving services contracts, affecting dozens of projects and victims.   The Defendant personally rigged numerous bids, often involving others in the scheme, corrupting the competitive bidding process and undermining the basic, but essential, notions of free and fair competition.  In doing so, the Defendant violated the Sherman Act, 15 U.S.C. § 1, and for the reasons set forth in this sentencing memorandum and its forthcoming Combined Motion and Brief for Downward Departure Under U.S.S.G.

1

§ 5K1.1, the United States recommends that the Court impose a term of imprisonment of 22 months, a $223,155 criminal fine payable in full before the 15th day after the date of judgment, a $100 special assessment, and no order of restitution.

## I.    Offense Background

During the charged bid-rigging conspiracy, the Defendant was President and part-owner of ASI, an asphalt paving company based in Pontiac, Michigan, which provided a range of asphalt paving services, such as large driveways, parking lots, private roadways, and public streets.  The Defendant shared ownership and the day-to-day management of ASI with his brother, Bruce Israel. Bruce Israel ran the sales side of the company, doing estimates, pitching customers, and submitting bids.   The Defendant handled field operations, logistics, and materials.  Potential customers seeking asphalt paving services would solicit bids from ASI and other companies, typically requiring bids from at least two or more providers.  The potential customer would award contracts for asphalt paving services after first reviewing and evaluating bids submitted by the providers.

From at least as early as March 2013 and continuing until at least as late as November 2018, the Defendant and ASI conspired with Al's Asphalt Paving Company, Inc. ("Al's Asphalt") and other co-conspirators to rig bids for contracts

to provide asphalt paving services in the State of Michigan.  The Defendant pleaded guilty to his participation in this conspiracy.[1]  Plea Agreement, Dkt. 12.

In furtherance of the conspiracy, the Defendant and other officers and employees of ASI engaged in conversations, meetings, and communications with their Al's Asphalt co-conspirators about which contracts each company wanted to win and agreed to rig bids in each other's favor.  The co-conspirators shared price-related information, including bid submissions, so that the agreed-upon losing co-conspirator could craft a higher-priced non-competitive bid, which it then submitted to the customer.  As a result, the agreed-upon winning company would indeed get the contract.  ASI and Al's Asphalt each provided and accepted payments for asphalt paving services under contracts obtained through this collusive and non-competitive process.  The Defendant was a key point of contact for rigged bids with Al's Asphalt.  Of Defendant's stipulated volume of commerce of $22,315,512, see Plea Agreement, ¶ 4(g), ASI was paid $10,406,230 for projects that it rigged with Al's Asphalt.

The Defendant also engaged in additional, uncharged bid rigging agreements with multiple other companies that provided asphalt paving services.  Of Defendant's stipulated volume of commerce, ASI was paid $11,909,282 for projects

---

[1] ASI pleaded guilty to two counts of violating Section 1 of the Sherman Act (15 U.S.C. § 1) and was sentenced on August 15, 2024, to a fine of $6,500,000.

affected by bid-rigging conspiracies for which Defendant is not charged.[2]   The projects associated with the uncharged conspiracies occurred during the charged relevant period and years following the relevant period.

The Defendant engaged in conversations and communications with individuals at uncharged co-conspirator companies, soliciting non-competitive, false bids from those companies to ensure ASI would win particular contracts.   The Defendant was the key point of contact for bid rigging for at least two uncharged co-conspirator companies for several years.   As such, when ASI wanted to secure a particular paving job, the Defendant personally would contact the appropriate individuals for the uncharged co-conspirator companies and ask them to submit non-competitive bids.[3]

---

[2] The payments derived from the uncharged bid rigging agreements are nonetheless attributable to the Defendant under U.S.S.G. § 1B1.3 as relevant conduct.

[3] *See, e.g.*, Ex. 1 ("[individual at uncharged co-conspirator company] told me he did what I asked… Let's get our numbers to AL's [Asphalt] [and two uncharged co-conspirator companies]"); Ex. 2 ("For clarity I have spoken to both [uncharged co-conspirator companies] And all is good"); Ex. 3 (regarding Al's Asphalt and two uncharged co-conspirator companies, "I just commuincted [sic] with all that this is a high want job for us."); Ex. 4 (contacting executive of uncharged co-conspirator company, "This is high want job for ASI… we will provide you with sub numbers"); Ex. 5 (contacting executive of uncharged co-conspirator company, "This is the job we spoke and ASI will want good pricing and is a high want job for us"); Ex. 6 (forwarding ASI bid proposal to executive of uncharged co-conspirator company, "Please review and call me about this").

For some projects, the Defendant gave the uncharged co-conspirator specific bid numbers and instructed them how to bid.[4]   In one particular project, the Defendant specifically directed the activities of employees of uncharged co-conspirator companies and one of his ASI employees, Timothy Baugher.[5]   The Defendant personally knew the customer, so ASI drafted the scope of the project and hand-picked the list of bidders.   During the bidding process, the Defendant instructed Baugher to draft a non-competitive bid for one of the uncharged co-conspirator companies.[6]   Once Baugher prepared the non-competitive bid as directed, the Defendant emailed it to an executive of the uncharged co-conspirator company, with the intention that the company would submit the inflated bid to the customer.[7]   In late 2018 or early 2019, the Defendant transitioned his role as the key contact for these uncharged co-conspirator companies to Baugher.

---

[4]   *See, e.g.*, Ex. 7 (Defendant emailing executive of uncharged co-conspirator company, attaching specific bid numbers); Ex. 8 (Defendant emailing employee of uncharged co-conspirator company and attaching a bid form prepared for that specific company to submit containing non-competitive pricing).

[5] Timothy Baugher pleaded guilty to one count of violating Section 1 of the Sherman Act (15 U.S.C. § 1); he was sentenced to six months incarceration and a $20,000 fine on April 16, 2025.

[6] *See* Ex. 9 (Defendant instructing Baugher, "Please send one over for [uncharged co-conspirator company]").

[7] *See* Ex. 10 (Defendant emailing executive of uncharged co-conspirator company, attaching a bid form prepared for that specific company to submit containing non-competitive pricing, and instructing the individual, "make [sure] you get with [another employee of uncharged co-conspirator company]").

The Defendant's participation in the charged and uncharged conspiracies affected victims, *i.e.*, customers that paid ASI and its co-conspirators for asphalt paving services projects that were awarded via rigged bids in furtherance of the above-described conspiracies.   The United States has identified 46 such organizational victims.

## II.    The Defendant's Properly Calculated Guidelines Range is 24–30 Months' Imprisonment

The United States objects to the offense level calculations set forth in the PSR insofar as they do not include a three-level increase under U.S.S.G. § 3B1.1 for the Defendant's role in the offense as a manager or supervisor.  <u>See</u> PSR ¶¶ 21, 23, 26, 27, 59, 61, 65, and Addendum.  The United States' calculation of the Defendant's offense level and Guidelines fine range is set forth in the following table:

| Description | U.S.S.G. § | Points |
|---|---|---|
| Base Offense Level | 2R1.1(a) | 12 |
| Conduct Involved Non-competitive Bids | 2R1.1(b)(1) | +1 |
| Volume of Commerce Attributable to the Defendant: $10M – $50M (stipulated to be $22,315,512) | 2R1.1(b)(2)(B) | +4 |
| *Aggravating Factors* | | |
| Role in the Offense | 3B1.1(b) | +3 |
| *Downward Adjustments* | | |
| Acceptance of Responsibility | 3E1.1(a) | -2 |
| Acceptance of Responsibility | 3E1.1(b) | -1 |
| **Total Offense Level** | 17 | |
| Guidelines Months of Imprisonment Range, Criminal History Category I | 24 – 30 months | |
| Guidelines Fine Range 1% - 5% of Volume of Commerce | $223,155 – $1,000,000 | |

## A. The Defendant Served as a Manager or Supervisor of the Conspiracies

The three-level manager/supervisor enhancement is appropriate in this case because Defendant was a manager or supervisor of criminal activity that involved five or more participants[8] or was otherwise extensive. U.S.S.G. § 3B1.1(b). In the Sixth Circuit, courts consider the following factors in deciding whether to apply the

---

[8] A "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n. 1. The Plea Agreement in this case stipulates that the offense included five or more participants. Plea Agreement ¶ 4(d).

7

enhancement under § 3B1.1: "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." § 3B1.1 cmt. n. 4; United States v. Ortiz-Flores, 768 F. App'x 490, 494 (6th Cir. 2019); United States v. Anderson, 795 F.3d 613, 617 (6th Cir. 2015). A defendant does not need to satisfy each factor for the enhancement to be appropriate. United States v. Gates, 461 F.3d 703, 709 (6th Cir. 2006). Rather, a combination of some of these factors can be sufficient for applying the enhancement. United States v. Lalonde, 509 F.3d 750, 766 (6th Cir. 2007). Further, "[t]he key issue is not direct control or ultimate decision-making authority, but rather the defendant's 'relative responsibility.'" United States v. Henley, 360 F.3d 509, 517 (6th Cir. 2004).

### i. Authority, Control, Planning, and Participation in Offense

The Defendant was directly involved in the charged bid-rigging conspiracy through his relationships with certain co-conspirators and by directing other participants. He and Bruce Israel introduced Baugher to ASI's bid rigging and recruited him into the scheme. In addition, the Defendant participated in bid rigging conduct with uncharged co-conspirator companies, leveraging his personal relationships with those companies. He personally planned and executed methodical

contacts with co-conspirators, including Al's Asphalt and uncharged co-conspirator companies, asking them to submit non-competitive bids to try to ensure that ASI would win the project.[9]   Some of those non-competitive bids were created by Baugher at the Defendant's direction, and were then submitted to the customer by uncharged co-conspirator companies, again at the Defendant's direction.[10]   Such activities demonstrate that the Defendant played an active and managerial role over multiple individuals within the charged and uncharged conspiracies.

The Defendant's conduct also meets the "participants" requirement under § 3B1.1.  § 3B1.1(b) requires that "the criminal activity involved five or more participants or was otherwise extensive," and the Defendant stipulated that the conspiracy with Al's Asphalt involved at least five participants.  See Plea Agreement ¶ 4(d).   To qualify for an enhancement under § 3B1.1(b), "the defendant must have been the… manager, or supervisor of **one or more** other participants,"—not all five participants.  § 3B1.1 cmt. n. 2 (emphasis added); Ortiz-Flores, 768 F. App'x at 495 ("A defendant can be a manager in a conspiracy involving five or more people if he recruits and exercises control over just one person.") (citing United States v. Richards, 508 F. App'x 444, 450 (6th Cir. 2012).  The Defendant's management and supervision of Baugher's bid rigging conduct alone satisfies this requirement.  While

---

[9] See, e.g., Exs. 1-9.

[10] See, e.g., Ex. 9, Ex. 10.

there is no dispute that Baugher eventually could and did rig bids independently, the Defendant and Bruce Israel first brought Baugher into the bid-rigging fold, showed him the ropes, and directed certain aspects of his bid-rigging activity. Thus, the Defendant was not a collaborative co-conspirator on equal footing with Baugher, but rather, he was a manager or supervisor of Baugher's participation in the illegal bid rigging conduct. Moreover, the Defendant's management and supervision of the bid rigging conduct of employees at the uncharged co-conspirator companies bolsters the appropriateness of the enhancement's application.

ii. *Fruits of the Offense*

Until late 2020, the Defendant owned almost 50% of ASI. As co-owner, he undoubtedly received through his usual compensation the benefits of the contracts tainted by bid-rigging. Moreover, in December 2020, the Defendant and his brother, Bruce Israel, sold around 60% of their equity ownership in ASI and related entities to a private equity fund. At that time, the Enterprise Value for the sale was $125 million. At least some portion of that value likely encompassed revenue received during the several years of charged and uncharged bid rigging conduct. As compared to Baugher and other ASI co-conspirators, Defendant (and Bruce Israel) claimed a larger share of the profits by virtue of his majority ownership of ASI.

10

### III.    Recommended Sentence

The United States respectfully recommends that the Court impose a sentence of 22 months imprisonment and a \$223,155 criminal fine.  For the reasons set forth in the forthcoming United States' Combined Motion and Brief for Downward Departure under U.S.S.G. § 5K1.1, the recommended sentence reflects an approximately ten percent downward departure from the bottom of the Guidelines imprisonment range under a total offense level of 17.  The United States respectfully submits that the recommended sentence is sufficient but not greater than necessary to meet the stated sentencing goals and factors set forth in 18 U.S.C. § 3553(a).

### A. The Recommended Sentence Satisfies 18 U.S.C. § 3553(a)

In addition to considering the Guidelines, the Court must also consider the other factors set forth in 18 U.S.C. § 3553(a) in determining and imposing a sentence that is "sufficient but not greater than necessary" to meet the specified sentencing goals.  The most relevant factors include the need to reflect the seriousness of the offense, to promote respect for the law, and to afford adequate deterrence, see 18 U.S.C. § 3553(a)(2)(A)-(B), the nature and circumstances of the offense and the history and characteristics of the Defendant, id. § 3553(a)(1), and the need to avoid unwarranted sentence disparities, id. § 3553(a)(6).   A term of 22 months

imprisonment and a $223,155 criminal fine is sufficient, but not greater than necessary, to achieve those objectives.

> i. *Imposing the recommended custodial sentence recognizes the seriousness of the offense and promotes respect for the law*

The Defendant's violations of the Sherman Act are serious because they attacked the basic principle of competition integral to our economic system.  Bid rigging is "both an unreasonable restraint of trade and a *per se* violation of the Sherman Act."  See United States v. Dynalectric Co., 861 F.2d 722 (6th Cir. 1988) ("[A]greements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se*.'"); see also id. (quoting Northern Pacific Railway v. United States, 356 U.S. 1 (1958) ("However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.").  Further, as the Sentencing Commission (the "Commission") recognizes, "there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) and horizontal market-allocation, can cause serious economic harm."  U.S.S.G. § 2R1.1 cmt. background.

These simple, but important, warnings of the dangers of antitrust violations were echoed by this Court's comments at the recent sentencing hearing in United

States v. Timothy Baugher, 2:24-cr-20504 (E.D. Mich.), held on April 16, 2025.  In that proceeding, the Court noted that there is "real harm" in bid rigging "because it interferes with fair competition," Baugher Sentencing Tr., Dkt. 36, 25:25-26:1, and that bid rigging "corrupt[s] the bidding process and [ ] affect[s] the fair and free competition that should exist in society." Id. 26:6-8.

The Defendant's bid-rigging conduct here is no different.  The Defendant and his co-conspirators tainted dozens of asphalt paving services contracts, robbing their customers of the benefit of free competition, a basic principle that is integral to our economic system.  The Defendant and his ASI co-conspirators reaped the benefits of the charged and uncharged conspiracies to the tune of over $22.3 million in rigged contracts.

The seriousness of the Defendant's conduct cannot be understated.  He was an active and extensive participant in the charged and uncharged conspiracies. He recruited other participants to the conspiracies.  He personally sought, received, and provided numerous non-competitive bids to his co-conspirators.   He also participated in meetings with co-conspirator executives in which non-competitive bidding was discussed.  Further, his involvement in the conspiracies as President and part-owner gave his co-conspirators the confidence to collude with ASI knowing that the company was committed to the criminal conspiracies from the top down.

By participating in the charged bid-rigging conspiracies, the Defendant committed a serious violation of law.  That a customer representative may, on occasion, have requested a non-competitive bid is irrelevant.  Bid-rigging is illegal, full-stop.  Furthermore, any such customer representative requests did not comprise the full universe of non-competitive bids that the Defendant sought or provided.  To believe otherwise would ignore the many customers, general contractors, and other project intermediaries who were unaware of the conspiracies and expected the Defendant and his competitors to submit legitimate, competitive bids to win their business.

Moreover, the Defendant chose to ignore the real-world impact of his conduct as the harm it caused was self-evident even without the benefit of formal antitrust training.  The Defendant was a veteran of the asphalt paving business.  He knew right from wrong when it came to dealing truthfully with customers.  And he understood the basic notion that, in a free market, competitors must compete and that his coordination with competitors on non-competitive bids corrupted that principle.

Finally, the recommended sentence promotes respect for the law.  As this Court noted recently, white-collar criminal defendants seem to "expect better, more lenient treatment than blue-collar defendants." Baugher Sentencing Tr. 27:7-9.  This expectation of leniency is at odds with this Court's stated responsibility to create

14

respect for the law and treat all types of defendants the same.  See id. 27:2-5.

Accordingly, a non-custodial sentence here would "reinforce[] the idea that white-collar defendants get more, better treatment and are . . . given a lot of different things than the blue-collar people."  See id. 27:10-14.  Imposing the recommended custodial sentence would counter this harmful perception and demonstrate that white-collar defendants are not entitled to special consideration, but, in fact, must face judgment by the criminal justice system on the same playing field as all defendants.  Further, a custodial sentence would underscore the significant role that the Sherman Act serves in our nation's economy and the importance of abiding by it.  Competitive bidding processes, such as the kind that takes place in the asphalt paving industry, rely on competitors to bid honestly and independently.  The recommended custodial sentence reaffirms the importance of keeping this competitive process collusion-free.

Accordingly, the United States' recommended custodial sentence properly accounts for the seriousness of the Defendant's conduct and promotes respect for the law.

### ii.  Imposing the recommended custodial sentence on the Defendant provides general deterrence

A custodial sentence of 22 months will provide adequate general deterrence. The threat of imprisonment as a general deterrent is necessary, especially in a case like this one, because bid-rigging is a particularly difficult crime to detect.  Illegal

conduct that enriches offenders while minimizing the risk of detection is especially pernicious and requires strong sentences to deter it.  See United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it" (internal citation omitted)). Given the immense effort that it takes to discover and prosecute bid-riggers like the Defendant, an insufficient penalty may embolden would-be offenders, undermining general deterrence.

Moreover, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  United States v. Peppel, 707 F.3d 627, 637 (6th Cir. 2013) (quoting United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006)).  Antitrust defendants frequently participate in antitrust conspiracies calculated to boost profits, take shortcuts, and subvert free and open competition. Thus, a non-custodial sentence may appear to the average antitrust defendant as merely the cost of doing business and undermine the need for deterrence.

This Court expressed similar concerns about a probationary sentence's effect on general deterrence when it imposed a sentence of incarceration in Baugher.  See generally Baugher Sentencing Tr. 27-28.  The Court noted that a probationary

16

sentence in that case may lead someone to think that he could rig bids worth millions of dollars and expect probation, thinking that he could do it "standing on [his] head." Id. 28:5-8. Adding the prospect of imprisonment to a would-be antitrust defendant's cost-benefit analysis in deciding whether to collude with competitors serves as a significant deterrent against doing so.

A combination of a custodial sentence and criminal fine furthers deterrence. Thus, the United States' recommended sentence serves the need for general deterrence and should be imposed.

> iii. *The recommended custodial sentence appropriately reflects the history and characteristics of the Defendant and the nature and circumstances of the offense*

The Defendant's net worth is ▮▮▮▮▮▮▮▮▮. PSR ¶ 57. Given his assets, a sentence of imprisonment will have a far greater impact on him than a monetary fine alone.

Also, based on the information submitted by the Defendant to Probation, the Defendant appears to have grown up in a positive environment and has close familial connections. PSR ¶ 36. As an adult, he had a very successful career in the asphalt paving industry. Even with all the benefits afforded to him due to his upbringing and career success, however, the Defendant chose to commit a serious felony. The Defendant both received and provided non-competitive bids as part of a bid-rigging conspiracy spanning multiple years. As a result, the Defendant's company and co-

conspirator companies were paid millions of dollars on tainted contracts. Given his position, the Defendant could have terminated his and others' involvement in the conspiracies and ceased this criminal activity prior to the end of the relevant period, but he did not. Instead, the Defendant repeatedly chose to violate the law and directed others to do the same.

Accordingly, the Defendant's personal history and characteristics, as well as the nature and circumstances of the offense, support the United States' recommended custodial sentence.

> iv. *Imposing the recommended sentence of imprisonment is consistent with pertinent policy statements regarding antitrust offenders*

Pertinent policy statements issued by the Commission support the United States' recommended sentence. The Court should consider these policy statements as a factor under 18 U.S.C. § 3553(a)(5). As previously noted, the Commission recognizes that restrictive agreements like bid-rigging can cause "serious economic harm." U.S.S.G. § 2R1.1 cmt. background. Accordingly, the Commission believes that "[a]bsent adjustments, the guidelines require some period of confinement in the great majority of [antitrust] cases that are prosecuted, including all bid-rigging cases." Id. Moreover, the Commission has "concluded that the definite prospect of prison [for economic crime], even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where

probation, not prison, was the norm." U.S.S.G. Ch. 1 Pt. A(4)(d). Similarly, "[s]ubstantial fines are [considered by the Sentencing Commission to be] an essential part of the sentence." U.S.S.G. § 2R1.1 cmt. background. The Commission's statements on the imposition of imprisonment and substantial fines for offenders like the Defendant clearly reflect its views that the seriousness of the Defendant's Sherman Act violations justify the United States' recommended sentence in this case.

> v. *Imposing the recommended sentence of imprisonment is consistent with the need to avoid unwarranted sentencing disparities*

Under 18 U.S.C. § 3553(a)(6), the Court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" A custodial sentence is necessary to address this factor, and the United States' recommended custodial sentence does not create unwarranted sentence disparities.

This Court has sentenced one other individual from ASI. See United States v. Timothy Baugher, 2:24-cr-20504 (E.D. Mich. Apr. 16, 2025) (sentence of six months' incarceration and $20,000 fine). A significantly longer sentence of incarceration is warranted for the Defendant for multiple reasons, including: (1) the Defendant's stipulated volume of commerce of over $22.3 million is greater than

that of any individual sentenced to date in this investigation;[11] (2) as described above, the Defendant held a position of authority, recruiting and directing other individuals in the bid rigging activity, including Baugher; and (3) as a majority owner of ASI during the relevant period, the Defendant logically profited from the illegal conduct more than any other individual sentenced to date, including the significant profit the Defendant obtained from the eventual sale of ASI to a private equity company.

Conversely, imposing a non-custodial sentence or a less significant custodial sentence would create an unwarranted sentencing disparity by treating the Defendant, a more culpable individual with further-reaching bid rigging conduct, more favorably than the less culpable individuals already sentenced.

Accordingly, imposing the United States' recommended custodial sentence would avoid unwarranted sentencing disparities.

---

[11] The stipulated volume of commerce in the <u>Baugher</u> case was $17.3 million.  <u>See also</u> <u>United States v. Edward D. Swanson</u>, 2:23-cr-20699-02 (E.D. Mich. Jun. 6, 2024) (VOC: $3.6 million; sentence of two years' probation and $36,577.48 fine); <u>United States v. David A. Coppola</u>, 2:24-cr-20404 (E.D. Mich. Jan. 31, 2025) (VOC: $3.6 million; sentence of two years' probation and $50,000 fine);  <u>United States v. Andrew Foster</u>, 2:23-cr-20381-02 (E.D. Mich. Mar. 18, 2025) (VOC: $3.1 million; sentence of two years' probation and $100,000 fine).

       *vi. Balancing the relevant factors, the recommended sentence is sufficient but not greater than necessary to achieve sentencing objectives*

The Defendant's illegal conduct was extensive and corrupted the competitive process for multiple years. Accordingly, his sentence must appropriately address the sentencing objectives of § 3553(a). The United States submits that its recommended sentence of 22 months imprisonment, a $233,155 criminal fine, and a $100 special assessment is sufficient but not greater than necessary to achieve those objectives.

## IV. Defendant does not merit a variance based on age or health

Based on the information provided to Probation and as represented to the United States by the Defendant's counsel, the Defendant has no immediate health concerns or medical needs that the Federal Bureau of Prisons ("BOP") cannot adequately meet. The BOP houses many inmates of similar age and general health and has access to the appropriate resources for both routine and specialist care that the Defendant may need if he is sentenced to a term of incarceration. Thus, the Defendant's age or health does not support a variance or other mitigation.

## V. Restitution is Discretionary

The Mandatory Victim Restitution Act does not mandate restitution for Title 15 offenses, including the Sherman Act, but only for crimes of violence and certain

offenses under Titles 18 and 21. 18 U.S.C. § 3663A(c)(1)(A).   Under the Crime

Victims' Rights Act, 18 U.S.C. § 3771, the United States has notified the

Defendant's victims of these proceedings.   The parties have agreed to recommend

the Defendant's sentence not include a restitution order.   Plea Agreement, ¶ 12.

## VI.   Conclusion

For the foregoing reasons, the United States respectfully requests that the

Court: 1) impose a sentence that includes a term of imprisonment of 22 months; 2)

order the Defendant to pay a $223,155 criminal fine payable in full within 15 days

of the judgment; 3) order the Defendant to pay a $100 special assessment; and 4) not

order restitution.

Respectfully submitted,

/s/ Melanie G. Wegner

Melanie G. Wegner (IL 6324826)
Ruben Martinez, Jr. (TX 24052278)
Allison M. Gorsuch (IL 6329734)
Trial Attorneys

Michael N. Loterstein (IL 6297060)
Assistant Chief

U.S. Department of Justice
Antitrust Division
209 S. LaSalle St. Suite 600
Chicago, Illinois 60604
Tel: 312-984-7200

Dated: May 12, 2025

CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Melanie G. Wegner
Melanie G. Wegner, IL 6324826
Trial Attorney
U.S. Dept. of Justice,
Antitrust Division
Chicago Office
209 S. LaSalle, Suite 600
Chicago, IL 60604
202-894-4250
Melanie.Wegner@usdoj.gov

Dated: May 13, 2025

23